Filed 8/29/16  P. v. Cortez CA2/8
Opinion on remand from Supreme Court

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B233833 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA345971) |
| v. | |
| NORMA CORTEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Dennis J. Landin, Judge.  Reversed with directions.

Robert E. Boyce, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews, Zee Rodriguez and Michael C. Keller, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \*

# INTRODUCTION

Defendant Norma Lilian Cortez was charged by amended information with premeditated murder (Pen. Code, § 187, subd. (a); count 1)[1] and attempted premeditated murder (§§ 187, subd. (a), 664; count 2), along with codefendant Rodrigo Bernal. The amended information alleged that Bernal personally used a firearm, discharged a firearm, and discharged a firearm causing great bodily injury or death. (§ 12022.53, subds. (b)-(d); counts 1 & 2). As to both Cortez and Bernal, it also alleged that a principal personally used a firearm, discharged a firearm, and discharged a firearm causing great bodily injury or death. (§ 12022.53, subds. (b)-(e)(1); counts 1 & 2). In addition, the information included gang allegations (§ 186.22, subd. (b)(1)(C), (4)). The jury found both defendants guilty and found all special allegations to be true. The court sentenced each defendant to an aggregate term of 50 years to life.

In May 2013, we unanimously affirmed Bernal's convictions, but in a divided opinion, we reversed Cortez's convictions. (*People v. Cortez* (May 30, 2013, B233833) (*Cortez I*) [nonpub. opn.].) *Cortez I* reversed her convictions based on three grounds: (1) prosecutorial misconduct in misstating the reasonable doubt standard during closing argument; (2) error in giving CALCRIM No. 361, which instructed the jurors they could consider Cortez's failure to explain or deny evidence against her that she could reasonably be expected to have explained or denied, based on what she knew; and (3) error in admitting Bernal's out-of-court statements to his nephew. The majority held the cumulative effect of these errors required reversal and declined to reach the remaining contentions of error Cortez raised on appeal. (*Cortez I, supra*, B233833.) Justice Grimes dissented from the reversal of Cortez's convictions, concluding there was no prosecutorial misconduct in the comments about the reasonable doubt standard, no error in giving CALCRIM No. 361, and no error in admitting Bernal's out-of-court statements to his nephew. (*Cortez I, supra*, B233833 (dis. opn. of Grimes, J.).)

---

[1] All undesignated statutory references are to the Penal Code, unless otherwise indicated.

The California Supreme Court granted review to consider the three grounds on which Cortez's convictions were reversed. (*People v. Cortez* (2016) 63 Cal.4th 101, 105.) Our high court agreed with the dissent's conclusions in *Cortez I* on these three issues, finding no trial court errors there. (*People v. Cortez, supra*, at pp. 105, 110-134.) The high court reversed our judgment and remanded for further proceedings consistent with its opinion. (*Id.* at p. 134.)

Because the *Cortez I* majority did not reach several of Cortez's contentions, we must now adjudicate those remaining claims of error. Specifically, Cortez contends (1) defense counsel was ineffective for failing to object to evidence of the meaning of her tattoo; (2) the trial court erred in failing to instruct the jury to view Bernal's out-of-court statements with caution (CALCRIM No. 334); and (3) the trial court applied the wrong legal standard in ruling on her motion for a new trial.[2] We find no errors on the first and second grounds, but agree with Cortez on the third ground. We therefore reverse and order a limited remand for the purpose of rehearing and redetermining the new trial motion.

## FACTS[3]

On September 3, 2008, childhood friends Miguel Guzman, 16 years old, and Emanuel Z., 19 years old, lived in the neighborhood near the intersection of 5th and Bonnie Brae Streets in Los Angeles. There was a lot of 18th Street gang graffiti in the area, and gang members frequented the neighborhood. Guzman and Emanuel were not gang members. As they were crossing 5th Street near the corner of Bonnie Brae Street, Emanuel heard a woman ask, "Where you guys from?" Emanuel saw a car driven by

---

[2] Cortez also joined in Bernal's argument that the court should have instructed on self-defense, imperfect self-defense, and provocation. We disposed of this challenge in *Cortez I*, when we affirmed Bernal's convictions. (*Cortez I, supra*, B233833.)

[3] We take the statement of facts in large part from our previous decision in *Cortez I*.

Cortez, with Bernal in the passenger seat, and a male in the back seat. The driver's window was down. Guzman and Emanuel did not respond and kept walking.

Emanuel heard the same woman's voice say, "Let them have it." He saw the car driven by Cortez stop. Guzman asked Emanuel, "Are they going to shoot or no[?]" Bernal got out of the car. He pulled a dark-colored gun from his waist, put his left hand on top of the car, and started shooting across the roof of the car at Guzman and Emanuel. Emanuel ran as soon as he saw the gun. Guzman appeared startled and put up his hands. Bernal shot five or six times, killing Guzman. Guzman did not have a gun and no one shot back at Bernal.

Emanuel ran inside a building near the 500 block of South Bonnie Brae Street. Guzman was behind him, but Emanuel did not know if Guzman made it to the building. When Emanuel went to the building's balcony, he saw Guzman on the pavement below being tended to by paramedics. Emanuel tried to leave but police would not let anyone out of the building. He did not immediately speak with police because he was "shocked" and afraid to talk to police. He spoke with detectives about a week after the shooting, when they encountered him unexpectedly at Guzman's house while Emanuel was visiting with Guzman's family. Emanuel identified Bernal as the shooter from a six-pack photo array and during the preliminary hearing, but not at trial. He identified three women in a six-pack photo array as resembling Cortez.

David R. also lived in the neighborhood near 5th and Bonnie Brae Streets. He heard the sound of brakes slamming and saw a light beige car driven by Cortez, with Bernal as a passenger, stop suddenly. He thought a child was in the back seat. He saw defendants yelling at Guzman, but could not tell what was being said because they were yelling over each other. Guzman may have responded "18th Street," but continued walking. Bernal got out of the car and pulled a gun from his waist and started shooting. Guzman put up his hands and looked scared. After the final gunshot, the beige car moved a couple of feet forward and stopped when Bernal said, "Hold on, . . . hold on." Once Bernal got in the car, he said, "Let's go, let's go." The car drove south on Bonnie Brae Street. David called 911, giving the operator a partial license plate number, and

4

then noticed Guzman lying on 5th Street, not moving or breathing. Police spoke to David on the day of the shooting as they went door to door canvassing the neighborhood.

Marvin B. also lived in the neighborhood. He was in his apartment when he heard a gunshot and, from his window, saw Bernal standing next to a parked car and firing shots. He heard more shots and saw Bernal chase someone across the street. He heard more gunshots after Bernal left his line of sight. Marvin walked outside and saw defendants' car on 6th Street, turning right on Alvarado Street. He saw the female driver's face. He spoke with police at the scene shortly after the shooting and provided a description of Cortez to police. That same day, he identified Cortez in a field showup.

Los Angeles Police Officer Javier Ramirez responded to the scene at 4:15 p.m. Guzman was bleeding from his mouth and not breathing. Because the shooting happened in 18th Street gang territory, responding officers drove to rival gang Rockwood's nearby turf. They saw a car matching the description and license plate number of the suspect, double-parked in the middle of the street near the 400 block of Witmer Street with its hazard lights on. Cortez was in the driver's seat and was taken into custody. A live round was found on the passenger side of the car of the same caliber and brand of several found at the scene of the shooting.

Cortez was interviewed by police on the evening of September 3, 2008. A recording of the interview was played for the jury. She said that on the day of the shooting, Bernal asked for a ride to pick up some money. They stopped and picked up a friend of Bernal's, who was "very young" and dressed in "gangster attire." Bernal sat in the front passenger seat, and his friend sat in the back. Bernal instructed her to "just drive around." He then told her to stop at 3rd and Bonnie Brae Streets so he and his friend could get out, and to keep on driving, as they would catch up with her. As she was driving, she heard some gunshots from two blocks away at 5th and Bonnie Brae Streets. Bernal and his friend then got back in her car. She did not know what had happened, and she did not ask them about the gunshots. She drove to where she was ultimately arrested, where Bernal and his friend got out of her car and told her to wait.

5

Cortez had known Bernal for about a year.  They were friends, even though she was in her 40's and he was in his 20's.  She did not believe Bernal was a gang member, but he did associate with the Rockwood gang.  She admitted that Bernal had a gun that he "always carries."

Later in the interview, Cortez changed her story, admitting her previous story was not true.  She said that before the shooting, she heard Bernal yelling, "Where you from," to two young men whom Cortez believed to be gang members.  They responded, "18th Street."  Bernal yelled, "Rockwood."  Cortez told Bernal to "[l]et it go."  But Bernal jumped out of the car, and then she heard gunshots.  The backseat passenger did not get out of the car.  Cortez kept driving, but did not get far because of traffic.  Bernal ran and jumped back in the car.  She started to "cuss[] him out."  He said nothing to her except, "drive."  She was scared and kept driving.  Bernal told her to stop, and she parked and put on her hazard lights.  Bernal and his friend took off to stash the gun.

On September 4, 2008, police interviewed Bernal's 17-year-old nephew, Oscar Tejeda.  The prosecutor played Tejeda's taped interview for the jury.  The interviewing officer falsely told Tejeda that Bernal had confessed to the shooting.  Tejeda told the officer that Bernal was a member of the Rockwood gang and goes by the moniker "Scooby."  Tejeda had seen Cortez socializing with Bernal and other members of the Rockwood gang.  According to Tejeda, Bernal stopped by his apartment on September 3 to drop off marijuana.  While at the apartment, Bernal told Tejeda "he went shooting with some—somebody at some woman I think."  He said "he went with some lady to go shoot somebody."  Bernal said "[h]e was shooting."  Bernal told Tejeda, "yesterday we went and we shot at two 18s."  He said the "driver was a girl."  Tejeda could not remember the female's name, but knew that she lived in his apartment building, and he knew who she was.  Tejeda believed she was dating another member of Rockwood.  Bernal also said that police had caught the female in her car while she waited for him.

Tejeda identified Cortez from a six-pack photo array.  Detective Arteaga asked whether Cortez's name was "Stephanie," "Sylvia," "Nancy," "Mickey," "Martha," or

6

"Norma." Tejeda said he believed her name is Norma, which is in fact Cortez's first name.

At trial, Tejeda testified that police came to his house with their guns drawn and handcuffed him and his sister. Some hours later police asked him for a gun and said that, if he did not hand it over, he would be arrested for aiding a murder suspect. Tejeda told police he did not know what they were talking about. He was scared. Police took Tejeda to the station. At the station, he lied to police about what Bernal had told him. In fact, Bernal did not say anything about a shooting. Tejeda felt pressured by the police to lie.

Tejeda did testify that Bernal was a member of the Rockwood gang. He admitted that the detective who interviewed him was friendly and polite. He also admitted that he had seen Cortez and Bernal socializing before with members of the Rockwood gang.

Gang expert Officer Antonio Hernandez of the Los Angeles Police Department testified that the Rockwood and 18th Street gangs are enemies and occupy adjacent territories. Gang members would not casually enter the territory of a rival gang. Bernal was a member of Rockwood, with the monikers "Scooby" or "Woody." The primary activities of the Rockwood gang are robberies, assaults, extortion, criminal threats, felony vandalisms and narcotics sales. Hernandez did not know Cortez to be a member of the Rockwood gang.

Cortez has a triangular, three-dot tattoo on her arm. According to Officer Hernandez, both gang members and nongang members may have this tattoo. It is a common tattoo for gang members and associates, however. The tattoo signifies the "crazy life," suggesting that its bearer is living a life of doing drugs, drinking, and committing crimes. Victim Guzman also had such a tattoo. Hernandez did not believe that Cortez, Guzman, and Emanuel were gang members. Someone is a gang associate, however, if they hang out with gang members, but have not been formally admitted into the gang.

7

When a gang member asks, "Where are you from," it is a challenge intended to initiate a confrontation. Based on a hypothetical mirroring the facts of this case, Officer Hernandez believed the shooting was for the benefit of the Rockwood gang.

While Bernal was in jail, he tried to send a letter to a Rockwood gang member, Jose Birrueta. In the letter, Bernal relayed Cortez's full name and booking number, and asked if Birrueta "could go and see her at Lynwood jail and talk to her to see what she's saying with me or against me. If she's against me write to me and let me know what's up so I can make a game plan. If she's with me let me know what she's saying and tell her to change her story because they don't have anything on both of us to say that I wasn't with her that day to let me go. She's the only one holding me back so when I get out I could help her with a lawyer." Bernal asked Birrueta to "convince her to say I was not with her, that they scare her, the police did, and she was just nervous and she just confused." Bernal also wrote "here's the name of the other fool who's snitching me out. Emanuel Z[.] [¶] . . . [¶] My nephew talked to him to say the police scare him and threatened him. So when the detectives came he said what he say, so to say different. He was scared, but it was a lie, what he said when he gets to court. My sister's kid."

Cortez testified in her own defense. She was not a member of a gang, and was not involved in any kind of gang mission on the day of the shooting. Bernal asked her for a ride so he could pick up some money he had loaned to someone. Cortez told him she would need gas money if she gave him a ride, and he agreed. They started driving on 6th Street near Bonnie Brae and Alvarado Streets and picked up Bernal's teenage friend, who got in the back seat. Bernal did not ask for permission to give his friend a ride, and Cortez did not ask why he got into the car. She figured he was Bernal's friend, and he was probably in the car because he owed Bernal the money. She did not care and did not see anything wrong in the situation. Bernal told Cortez to continue driving, and he would direct her where to go.

As they neared the intersection of 5th and Bonnie Brae Streets, Cortez saw two young men in the street yelling "18th Street" and making signs with their hands. No

one in her car responded to the young men, but Bernal jumped out of her still moving car without saying a word. Cortez saw one of the young men "reaching like a motion like to getting a gun." She was still driving and then heard gunshots. Bernal then got back into the car and said, "let's go."

Bernal directed Cortez to another location. She stopped where Bernal directed her, and Bernal and his friend got out of the car. Cortez knew that something bad had happened but did not want to ask what because she was scared. She put on her hazard lights and waited for Bernal to return. She was a "bundle of nerves" and did not go home because she was not thinking. She was "frozen" and did not know what to do. The police arrived 10 minutes later and arrested her. She initially was not truthful with the police because she was scared.

Cortez believed Bernal to be a nice, helpful person. She met him when she moved into her apartment, and Bernal and some of his friends offered to help her with her groceries. She testified that was "how we developed . . . a friendship." Their relationship was platonic. She did not think he was a gang member, although she admitted telling police that Bernal talked a lot about the Rockwood gang and was proud of it, and that she knew him to get in fights and carry a gun at all times. Cortez also admitted that she knew she lived in Rockwood gang territory, but later denied that there was gang activity in her neighborhood or the neighborhood where the shooting occurred.

Cortez's son, Steven McBride, knew Bernal and assumed he was a gang member. He had seen his mother and Bernal hang out together.

Cortez's ex-husband, Schuyler McBride (McBride), testified that when he first started dating Cortez, he "[did]n't believe she was a [gang] member," although she had friends who were gang members. They both socialized with gang members in their community. Because Cortez and McBride socialized with gang members, they had "street smarts about gangs," and knew "what gangs were all about." When asked whether it would surprise McBride to learn that Cortez was friends with Bernal, he responded, "No."

9

The pastor and a member of Cortez's church, New Hope Ministries, testified that Cortez attended Bible study and was involved in some of the church's outreach programs. According to pastor Troy Nakama, the ministry "is very unique because it reaches out to people that normally wouldn't attend churches. We target individuals that are struggling in life and such." The ministry runs a gang outreach program, including a men's rehabilitation. Pastor Nakama could not recall Cortez being involved in any of the ministry's outreach programs, but Susana Rodriguez, Cortez's friend and a member of her church, believed Cortez did some outreach work, although Cortez was not involved in gang outreach specifically.

Kimi Lent, a gang interventionist, testified that gangs are more prevalent in low income communities, and that people in such communities had fewer resources and would rely on each other for transportation. In gang culture, a "mission" is a planned crime. Driveby shootings can be conducted as part of a mission. Gang members would not normally carry out a mission with a nongang member.

Bernal proffered the testimony of Dr. Mitchell Eisen, a psychologist with expertise on eyewitness identifications and suggestibility, who opined that witness identifications when weapons are involved may be less reliable because witnesses tend to focus on the weapons rather than the suspect, and police administering identification procedures may influence those identifications.

## DISCUSSION

**1.     Ineffective Assistance of Counsel**

Cortez contends her counsel's failure to object to evidence of the meaning of her triangular, three-dot tattoo amounted to ineffective assistance. She asserts the evidence constituted inadmissible character evidence of her supposed propensity to do drugs and live a life of crime. We reject this claim and hold Cortez has not shown ineffective assistance of counsel.

"Under both the Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution, a criminal defendant has a right to the assistance of counsel. [Citations.] This right 'entitles the defendant not to some bare

10

assistance but rather to *effective* assistance.'" (*People v. Mitchell* (2008) 164 Cal.App.4th 442, 466.) To demonstrate ineffective assistance of counsel, Cortez must show that counsel's performance fell below an objective standard of reasonableness, *and* that she was prejudiced by counsel's performance. (*Id.* at p. 467.)

"Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" (*People v. Lucas* (1995) 12 Cal.4th 415, 436-437.) On direct appeal, we will reverse for ineffective assistance only when the record "affirmatively discloses that counsel had no rational tactical purpose for his act or omission." (*People v. Fosselman* (1983) 33 Cal.3d 572, 581.) "As [our Supreme Court has] noted repeatedly, the mere failure to object rarely rises to a level implicating one's constitutional right to effective legal counsel." (*People v. Boyette* (2002) 29 Cal.4th 381, 433.)

The prejudice that Cortez must show consists of "a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" (*People v. Wharton* (1991) 53 Cal.3d 522, 575.)

At trial, Officer Hernandez denied that the three dots tattoo "necessarily mean[s] they are a gang member." Still, it was a common tattoo for gang members and gang associates. When the prosecutor sought to admit the exhibit displaying Cortez's tattoos (the three dots tattoo among others), defense counsel asked for an offer of proof. The prosecutor responded the tattoos showed Cortez had "a relationship with the gang culture," and he was offering the evidence in anticipation of her defense that she was innocently caught up in the shooting and was not a gang member or associate. He argued the evidence that she was getting tattoos identifying with the gang culture was "something that the jury should be able to consider."

Defense counsel responded, "I didn't object to the 'my crazy life' triple-dot tattoo because I know there's some gang relation, but the other tattoos my client has is

11

'Cortez' on her back with some rose thorns underneath it . . . . The other one is a tribal band on her wrist. There's no indication that has anything to do with gang culture."

On direct examination, Officer Hernandez opined that victim Guzman was not "associated with any street gang." This was because the officer had never come across Guzman in the territories he patrolled, other officers that worked the pertinent area had never heard of Guzman, and there were no field interview cards documenting him as a gang member or associate. On cross-examination, Hernandez clarified that although he believed victim Guzman was not a gang member, he "[c]ould have been" an associate. But the officer had no information that Guzman was a gang associate. If someone told him Guzman had the three dots tattoo, it would "[m]ake no difference" to the officer's opinion about whether he was a gang associate.

Evidence Code section 1101, subdivision (a) provides that "evidence of a person's character or a trait of his or her character . . . is inadmissible when offered to prove his or her conduct on a specified occasion." Section 1101, subdivision (b), however, permits admission of such evidence when it is relevant to prove motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident. It is well settled that gang evidence is highly probative of intent and motive. (E.g., *People v. Garcia* (2008) 168 Cal.App.4th 261, 277.)

Cortez contends the tattoo evidence was not gang evidence, citing Officer Hernandez's testimony that the three dots tattoo made no difference to his opinion about whether Guzman was a gang associate. She argues the evidence was merely inadmissible character evidence of her propensity to live a life of crime and drugs. Thus, according to her, defense counsel had no valid tactical reason for failing to object.

But Cortez has construed Officer Hernandez's testimony too narrowly. Hernandez testified that Cortez's tattoo is common among gang members and associates. The tattoo in combination with other evidence demonstrated that Cortez associated with gang members. There was evidence she was friends with Bernal (an admitted Rockwood member), socialized with other Rockwood members besides Bernal, was dating a Rockwood member, yelled a gang challenge to the victims, and

12

said, "Let them have it," right before the shooting started. This evidence of association belied her claimed surprise that Bernal started shooting in rival gang territory and is therefore probative of her knowledge and intent. The officer's testimony that the three dots tattoo made no difference to his opinion about *Guzman's* gang association does not render the tattoo irrelevant with respect to Cortez's association. Besides the tattoo, the hypothetical posed to the officer gave no other information suggesting Guzman associated with a gang. It was thus understandable he found the tattoo alone made no difference with respect to Guzman.

Because the tattoo evidence was relevant to Cortez's motive and intent, any objection would have been meritless, and Cortez cannot demonstrate prejudice or ineffective assistance of counsel.

## 2. Accomplice Testimony

Cortez contends the trial court should have instructed the jury, sua sponte, to view Bernal's comments to Tejeda with caution, as set forth in CALCRIM No. 334. We find no error here.

CALCRIM No. 334 states in pertinent part: "Any (statement/[or] testimony) of an accomplice that tends to incriminate the defendant should be viewed with caution. You may not, however, arbitrarily disregard it. You should give that (statement/[or] testimony) the weight you think it deserves after examining it with care and caution and in the light of all the other evidence." The instruction also tells the jury that it may not convict the defendant based on the accomplice's testimony alone. Rather, independent supporting evidence must corroborate the accomplice's testimony. (*Ibid.*) Section 1111 is the statutory authority on which CALCRIM No. 334 is based. That section states in part: "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense . . . ." (§ 1111.)

We review this claim of instructional error de novo. (*People v. Guiuan* (1998) 18 Cal.4th 558, 569.) A court should give CALCRIM No. 334 when an accomplice testifies in a manner that tends to incriminate the defendant. (*People v. Howard* (2008)

13

42 Cal.4th 1000, 1021-1022; *People v. Guiuan, supra*, at p. 569.) An accomplice's testimony includes "'all oral statements made by an accomplice or coconspirator under oath in a court proceeding *and* all out-of-court statements of accomplices and coconspirators used as substantive evidence of guilt which are made under suspect circumstances.'" (*People v. Williams* (1997) 16 Cal.4th 153, 245.) "The most obvious suspect circumstances occur when the accomplice has been arrested or is questioned by the police. These circumstances are most likely to induce self-serving motives and hence untrustworthy and unreliable evidence." (*People v. Jeffery* (1995) 37 Cal.App.4th 209, 218.) "'On the other hand, when the out-of-court statements are not given under suspect circumstances, those statements do not qualify as "testimony" and hence need not be corroborated under . . . section 1111.'" (*People v. Williams, supra*, at p. 245.) Statements are not "suspect" when they are trustworthy and reliable, such as when they fall within an exception to the hearsay rule. (*People v. Sully* (1991) 53 Cal.3d 1195, 1230; *People v. Jeffery, supra*, at p. 218.)

Here, Bernal did not make his statements to Tejeda under suspect circumstances, and the statements were not, therefore, testimonial for purposes of section 1111. As our Supreme Court determined, Bernal's statements to a close family member in the family home fell under the hearsay exception for statements against penal interest (Evid. Code, § 1230), and they were trustworthy and reliable. (*People v. Cortez, supra*, 63 Cal.4th at pp. 123-128.) Accordingly, the trial court had no obligation to give an accomplice testimony instruction telling the jury to view the statements with caution.

3.    **New Trial Motion**

Cortez contends the court abused its discretion by applying the wrong legal standard in ruling on her new trial motion when it failed to independently review the evidence. We agree the court applied the wrong standard and should reconsider the motion.

Cortez's motion for a new trial argued there was insufficient evidence to support the verdict (§ 1181, subd. 6), the trial court improperly admitted Bernal's statements to his nephew (§ 1181, subd. 5), and her due process rights were violated when the trial

14

court limited the length of her closing argument (e.g., *People v. Oliver* (1975) 46 Cal.App.3d 747, 751). The court and counsel did not spend a significant amount of time on the sufficiency of the evidence issue at the hearing on the new trial motion. The trial court observed, "I do think there was sufficient evidence for a jury to make the decision in this case. Unfortunately, for Ms. Cortez, the jurors chose to believe the People's witnesses regarding what she did and what she said at the time of the shooting." Defense counsel asked to be heard on Bernal's statements to his nephew, and stated, "In regards to the sufficiency of the evidence, the court was present." The court responded, "Sure." This was all the court and counsel said on the sufficiency of the evidence. The court denied the new trial motion.

Under section 1181, subdivision 6, a trial court may grant a new trial or modify the verdict to a lesser included offense when the verdict is "contrary to law or evidence." We review the trial court's denial of a motion for a new trial for abuse of discretion. (*People v. Knoller* (2007) 41 Cal.4th 139, 156.) "Such an abuse of discretion arises if the trial court based its decision on impermissible factors [citation] or on an incorrect legal standard [citations]." (*Ibid*.)

In determining whether the verdict is contrary to the evidence, the trial court "independently examines all the evidence to determine whether it is sufficient to prove each required element beyond a reasonable doubt *to the judge*, who sits, in effect, as a '13th juror.'" (*Porter v. Superior Court* (2009) 47 Cal.4th 125, 133 (*Porter*).) This is distinct from the court's decisionmaking process on a motion for acquittal under section 1118.1, when the court "evaluates the evidence in the light most favorable to the prosecution" and determines whether "there is any substantial evidence . . . to support the elements of the offense." (*Porter, supra*, at p. 132.) Instead, in ruling on a new trial motion, the court extends "no evidentiary deference." (*Id.* at pp. 132-133.) While it is "guided by a presumption in favor of the correctness of the verdict and proceedings supporting it," the court "'should consider the proper weight to be accorded to the evidence and then decide whether or not, in its opinion, there is sufficient credible evidence to support the verdict.'" (*People v. Davis* (1995) 10 Cal.4th 463, 524.) "The

trial court is not bound by the jury's determinations as to the credibility of witnesses or as to the weight or effect to be accorded to the evidence." (*People v. Dickens* (2005) 130 Cal.App.4th 1245, 1251.) "[T]he presumption that the verdict is correct does not affect the trial court's duty to give the defendant the benefit of its independent determination as to the probative value of the evidence." (*Id.* at p. 1252.)

The importance of keeping distinct a trial court's responsibility in deciding a motion for new trial, on the one hand, and a motion for a section 1118.1 acquittal, on the other, involves more than just faithful application of different statutes. The very process has significant constitutional ramifications. As our Supreme Court explained in *Porter*, an order granting a section 1118.1 acquittal determines that as a matter of law the prosecution did not prove its case beyond a reasonable doubt. "In considering this legal question, 'a court does not "'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.' [Citation.] Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [Citation.]' This test is the same as that used by appellate courts in deciding whether evidence is legally sufficient to sustain a verdict." (*Porter, supra*, 47 Cal.4th 125, 132.) The grant of an acquittal motion has double jeopardy consequences and prohibits a retrial. "Because the prosecution had a full opportunity to prove the facts necessary for a conviction but failed to do so, double jeopardy bars a second bite at the apple. (*Hudson v. Louisiana* (1981) 450 U.S. 40, 43-44, 101 S.Ct. 970, 67 L.Ed.2d 30; *Burks v. United States* [(1978)] 437 U.S. [1,] 16-18.)" (*Id*. at p. 133.)

The grant of a motion for new trial does not have double jeopardy consequences. This follows from the true meaning of the "13th juror" metaphor. It is not that the court in granting a new trial effectively acts as a successor trier of fact and disagrees with the jury. It is that the judge is symbolically *added* to the jury so that the jury becomes comprised of 13 persons, 12 of whom have voted "guilty" and one (the judge) who has voted "not guilty." "In doing so, the judge acts as a 13th juror who is a 'holdout' for

16

acquittal. Thus, the grant of a section 1181(6) motion is the equivalent of a mistrial caused by a hung jury. (*Veitch v. Superior Court* (1979) 89 Cal.App.3d 722, 727.)" (*Porter, supra*, 47 Cal.4th at p. 133.) For this reason our Supreme Court has "repeatedly held that an order granting a new trial under section 1181(6) is not an acquittal and does not bar retrial on double jeopardy grounds." (*Ibid.*)[4]

Here, the court's comments suggest it did not independently review the evidence and decide the proper weight to accord it. The comment that "there was sufficient evidence for a jury to make the decision in this case" indicates deference to the jury's weighing of the evidence. The court's next comment that "[u]nfortunately, for Ms. Cortez, the jurors chose to believe the People's witnesses," further indicates that the court relied on the jury's judgment about credibility. "[I]n ruling on the new trial motion the trial court can—and should—consider credibility independently of the jury's conclusions." (*Barrese v. Murray* (2011) 198 Cal.App.4th 494, 504.) From its comments, we may conclude the court did not do this. It was particularly important for the court to independently weigh the evidence and assess credibility in a case like this, which was very much a contest between Cortez's version of why she was in the car, on the one hand, and the evidence that she took an active role in the shooting, on the other. But the court's comments show that it applied something more akin to the substantial evidence standard we apply on appeal, in which we defer to the fact finder on credibility issues and look only for substantial evidence supporting the jury's verdict. These circumstances require a limited remand to allow the court the opportunity to rehear the motion for a new trial. (*People v. Robarge* (1953) 41 Cal.2d 628, 635.)

Respondent's reliance on *People v. Price* (1992) 4 Cal.App.4th 1272 (*Price*) does not convince us otherwise. In *Price*, the court denied the defendant's new trial motion, stating: "'Okay, And, counsel, I did read and consider the points and authorities, and I didn't take it lightly, but I respectfully deny the request for a new trial.

---

[4]    Double jeopardy principles do not bar retrial if a mistrial was caused by a hung jury or other "manifest necessity." (*Oregon v. Kennedy* (1982) 456 U.S. 667, 679.)

17

I think the evidence was sufficient, and *I think that the jury—there was enough evidence there for the jury to do what the jury did . . .*' (Italics added.)" (*Id.* at p. 1275.) The appellate court concluded: "[T]he court's exercise of its independent judgment is reflected in its statement that the evidence was sufficient. The court's further comment there was substantial evidence to support the jury's determination is surplusage. [¶] . . . Although it would have been preferable for the court to have been more specific, stating it was denying the motion based on its independent weighing of the evidence, its failure to do so and its use of less than artful language cannot be equated with having applied the wrong standard." (*Id.* at pp. 1275-1276.)

The trial court's comments in *Price* displayed less deference to the jury's findings than the court's comments here. The *Price* court expressed two thoughts—that *the court* thought the evidence was sufficient, and then that there was enough evidence to support the jury's decision. The court here said only that it thought there was sufficient evidence for the jury to make the decision. Moreover, the *Price* court did not comment on the "unfortunate" circumstance that the jury appeared to have believed the prosecution witnesses.

Our dissenting colleague sees no purpose to be served by remanding for the trial court to reconsider the new trial motion, "in view of the Supreme Court's findings of substantial evidence, which findings are the law of this case." (Conc. & dis. opn., *post*, at p. 3.) Under the law of the case doctrine, "'the decision of an appellate court, stating a rule of law necessary to the decision of the case, conclusively establishes that rule and makes it determinative of the rights of the same parties in any subsequent retrial or appeal in the same case.'" (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 301.) But, "[g]enerally, the doctrine of law of the case does not extend to points of law which might have been but were not presented and determined in the prior appeal." (*Estate of Horman* (1971) 5 Cal.3d 62, 73.)

Law of the case does not bar a remand on the new trial motion or render such a remand meaningless. As we have discussed and *Porter* teaches, the trial court's task in ruling on a new trial motion under section 1181, subdivision 6, is not to determine

18

whether substantial evidence supported the verdict—it is to independently examine all the evidence to determine whether the prosecution proved the elements of the offense beyond a reasonable doubt. (*Porter, supra*, 47 Cal.4th at pp. 132-133.) The substantial evidence standard is manifestly different than the standard the court must apply as the so-called 13th juror. Thus, any explicit or implicit findings of the Supreme Court that substantial evidence supported the verdict would not determine the issue the trial court must address on remand. Law of the case has no application here.

But the Supreme Court did not even determine that substantial evidence supported the verdict against Cortez. The dissent gives two examples from the Supreme Court's opinion in this matter that in the dissent's view shows the Supreme Court has found substantial evidence to support the verdict. Each of those examples deals with an instruction or evidentiary ruling, not the sufficiency of evidence to support a finding of guilt. First, the Supreme Court found that there was sufficient evidence to justify the giving of CALCRIM No. 361 on the defendant's failure to explain evidence. But the Supreme Court did not suggest by this holding that there was substantial evidence to support the verdict. Even where there is substantial evidence of a failure to explain and CALCRIM No. 361 is given, the instruction expressly tells the jury that the lack of explanation is not enough to convict. "Any such failure is not enough by itself to prove guilt. The People must still prove the defendant guilty beyond a reasonable doubt." (CALCRIM No. 361.) The point is easily shown by the converse: if the trial court had determined there was insufficient evidence to give the instruction, that preliminary finding would have nothing to do with an ultimate determination of whether there was sufficient evidence to support a guilty finding.

The second example offered by the dissent is the Supreme Court's statement that there was "ample evidence" that codefendant Bernal had personal knowledge of the information he told witness Tejeda. But that determination of sufficient evidence was not made in the context of the jury's determination of guilt. Rather, it was the court's conclusion that there was sufficient evidence of a preliminary fact necessary to find an exception to the hearsay statements admitted by the trial court. (See *People v. Clark*

19

(2016) 63 Cal.4th 522, 562 [noting the preliminary facts required for coconspirator exception of Evid. Code, § 1223].)

## DISPOSITION

The judgment is reversed and the matter is remanded for the trial court to rehear and redetermine Cortez's motion for a new trial applying the appropriate standard.  If the court grants Cortez's motion for a new trial, it shall order a new trial.  If the court denies the motion for a new trial, it shall reinstate the judgment.


FLIER, J.

I CONCUR:


RUBIN, Acting P. J.

**Grimes, J., Concurring and Dissenting.**

Respectfully, I dissent from the majority's finding that the trial court applied the wrong standard in ruling on Cortez's motion for new trial. I concur with the majority's finding there is no merit to the claims of ineffective assistance of counsel and failure to instruct the jury with CALCRIM No. 334.

**1.     The Trial Court Properly Denied the Motion for New Trial.**

After the verdicts, Cortez moved for a new trial under Penal Code section 1181, subdivision 6, reasoning there was insufficient evidence to support the verdict. She also raised other bases for the motion, which are not at issue on appeal. Specifically, she contended that the trial court improperly admitted codefendant Bernal's statements to his nephew Oscar Tejeda (§ 1181, subd. 5), and that her due process rights were violated when the trial court limited the length of her closing argument. At the hearing on the motion, the trial court and the attorneys devoted significant time to discussing the admission of Bernal's out-of-court statements to his nephew, and discussed the sufficiency of the evidence issue only in passing. The trial court commented, "I do think there was sufficient evidence for a jury to make the decision in this case. Unfortunately, for Ms. Cortez, the jurors chose to believe the people's witnesses regarding what she did and what she said at the time of the shooting." The court denied the motion. Apparently acceding the sufficiency of the evidence, defense counsel stated, "In regards to the sufficiency of the evidence, the court was present." The court responded, "Sure." This was the extent of the discussion by counsel and the court.

Cortez contends the trial court abused its discretion because it applied the wrong legal standard, and accordingly failed to independently review the evidence. Under Penal Code section 1181, subdivision 6, a trial court may grant a new trial or modify the verdict to a lesser included offense when the verdict is "contrary to law or evidence." We review the trial court's denial of a motion for a new trial under the deferential abuse of discretion standard. An abuse of discretion occurs "if the trial court based its decision on

impermissible factors [citation] or on an incorrect legal standard [citations]." (*People v. Knoller* (2007) 41 Cal.4th 139, 156.)

In determining whether to grant a motion for a new trial under Penal Code section 1181, subdivision 6, the trial court "independently examines all the evidence to determine whether it is sufficient to prove each required element beyond a reasonable doubt *to the judge*, who sits, in effect, as a '13th juror.' " (*Porter v. Superior Court* (2009) 47 Cal.4th 125, 133.) Unlike a ruling on a motion for acquittal under section 1118.1, where the trial court "evaluates the evidence in the light most favorable to the prosecution," the court extends "no evidentiary deference in ruling on a section 1181(6) motion for new trial." (*Porter*, at pp. 132-133.) "It is, however, guided by a presumption in favor of the correctness of the verdict and proceedings supporting it. [Citation.] The trial court 'should [not] disregard the verdict . . . but instead . . . should consider the proper weight to be accorded to the evidence and then decide whether or not, in its opinion, there is sufficient credible evidence to support the verdict.' " (*People v. Davis* (1995) 10 Cal.4th 463, 524.)

Cortez interprets the court's comments as improper deference to the jury's verdict, and an abdication of its duty to independently review the evidence. However brief the court's comments were, it is clear the sufficiency of the evidence issue only merited a brief discussion, given the priority counsel placed on the other issues presented by the motion (such as Bernal's out-of-court statements). Cortez has taken the court's comments out of the larger context of the issues presented by the motion and attributed unwarranted meaning to them. Viewed in the proper perspective, it is obvious the trial court independently evaluated the evidence, and explicitly found the evidence was sufficient. When defense counsel alluded to the court being "present" for the trial to evaluate the sufficiency of the evidence, the court appeared to acknowledge its proper role as the 13th juror. The court's other comments about the jury are surplusage, and do not show the court used an incorrect legal standard. "Although it would have been preferable for the court to have been more specific, stating it was denying the motion based on its independent weighing of the evidence, its failure to do so and its use of less

2

than artful language cannot be equated with having applied the wrong standard." (*People v. Price* (1992) 4 Cal.App.4th 1272, 1275 [finding the court did not apply the wrong legal standard when it stated " 'I think the evidence was sufficient, and I think that the jury—there was enough evidence there for the jury to do what the jury did . . . .' "].)  Therefore, I find no abuse of discretion.

**2.      The Supreme Court's Opinion Is Law of This Case.**

Even if the trial court had erred, I see no purpose to be served by remanding for the trial court to determine anew whether substantial evidence supported the verdict, in view of the Supreme Court's findings of substantial evidence, which findings are the law of this case.  The Supreme Court's findings were not made in the context of deciding the propriety of the trial court's ruling on the motion for new trial, an issue that was not before the Supreme Court, since the majority had reversed on other grounds without reaching this issue.  But the Supreme Court opinion is replete with factual findings made in the context of deciding other issues of law from which the only reasonable conclusion to be drawn is that substantial evidence supports the verdict.  I recite a few examples.

In finding that the trial court properly instructed the jury with CALCRIM No. 361, the Supreme Court held "that the instruction applies only when a defendant completely fails to explain or deny incriminating evidence, or claims to lack knowledge and it appears from the evidence that the defendant could reasonably be expected to have that knowledge." (*People v. Cortez* (2016) 63 Cal.4th 101, 117.)  The Supreme Court cited the following substantial evidence that supported giving the instruction in this case.

"During her testimony, defendant acknowledged that, after Bernal exited her car, she heard gunshots that sounded very close.  She also testified, however, that she did not know any of the following information:  (1) 'why [Bernal] got out' of the car; (2) what had happened; (3) 'where [the gunfire] was coming from'; (4) how a bullet ended up on the floorboard of her car; and (5) whether the shooting 'could be in regards to gang activity.'

"However, there was ample evidence that defendant 'could reasonably be expected to know' these facts or circumstances.  ([*People v*.] *Adamson* [(1946)] 27 Cal.2d

3

[478, 491].) First and foremost, in her own statement to police, which was played to the jury as evidence, she stated the following: Bernal was an 'associate' of the Rockwood gang and 'talk[ed] a lot about' it. As she approached the area of the shooting, she saw 'two young gang members' across the street. Bernal 'yelled out, "Where you from?" ' The young men responded, ' "18th Street." ' Defendant then said to Bernal, ' "Come on, man." [. . . "] . . . Don't be stupid." ' ' "Fool, stop. Stop. Just let it go. Let's go." ' Bernal 'didn't listen,' and defendant saw him 'open[] the passenger door' and 'jump[] out of the car.' She heard Bernal yell, ' "Rockwood," ' and '[t]hen [she] heard the gunshots.' Though she did not actually see Bernal firing, she 'assumed' he was firing '[a]t those kids' who had responded ' "18th Street." ' '[I]n [her] mind,' Bernal had 'hit them up,' i.e., 'shot at those kids.' At that point, she realized it was a gang incident. Bernal then 'chased' the car and 'got in.' Defendant 'couldn't believe what [had] happened' and 'cussed [Bernal] out,' saying, ' "Fucking asshole, what the fuck are you doing?" ' Bernal said, ' "Let's drop my homeboy off," ' and told defendant to drive to the location where they had earlier picked up his friend. A few buildings before they reached that location, Bernal told defendant to stop and let him out, and said, ' "meet me there where we picked up homeboy at." ' Defendant replied, ' "Okay," ' drove to the designated spot, stopped her car, put on her emergency lights, and waited. Second, during her trial testimony, defendant added that, before Bernal exited the car, the victims were 'yelling out, "where you from," ' and ' "18th Street," ' and were 'throwing their arms up in the air, making signs' and 'doing hand gestures.' Finally, other witnesses testified at trial that the driver of the car slammed on the car's brakes and, along with the passenger, was yelling at the victims; that a female in the car said, ' "where are you from" ' and ' "Let them have it" '; that the passenger exited the car and started shooting from the passenger side, either from the trunk area or from over the roof while resting his arm and hand on it; and that after the shooting, the shooter yelled, ' "Hold on," ' the driver slammed on her brakes again, the shooter jumped back in, and the car drove away. Given this evidence, the trial court properly gave the instruction notwithstanding defendant's professed lack of knowledge about certain matters." (*People v. Cortez*, *supra*, 63 Cal.4th at pp. 121-122.)

4

The Supreme Court also found the trial court properly admitted the out-of-court statements that codefendant Bernal made to witness Tejeda. After reciting the "ample evidence" that codefendant Bernal had personal knowledge of the matters he told Tejeda, the Supreme Court found, "On this record, a jury could reasonably conclude that the shooting was a joint, planned undertaking of Bernal and defendant. It could also reasonably conclude that Bernal and defendant had had conversations in order to coordinate their joint undertaking such that Bernal had personal knowledge of whether defendant knew of and went along with a plan to commit the shooting." (*People v. Cortez*, *supra*, 63 Cal.4th at p. 125.)

Thus, the Supreme Court decided Cortez completely failed to explain or deny incriminating evidence against her, and the record supported a jury conclusion that Cortez jointly planned the shooting with Bernal. With these facts established as the law of this case, I do not believe any court could find the verdict is not supported by substantial evidence. (*Tally v. Ganahl* (1907) 151 Cal. 418, 421 ["[W]here, upon an appeal, the supreme court, in deciding the appeal, states in its opinion a principle or rule of law necessary to the decision, that principle or rule becomes the law of the case and must be adhered to throughout its subsequent progress, both in the lower court and upon subsequent appeal. . . ."]; see also *Steelduct Co. v. Henger-Seltzer Co.* (1945) 26 Cal.2d 634, 643-644 [ruling of appellate court that the evidence was legally insufficient to sustain a defense was the law of the case on retrial].)

I would affirm the judgment.


GRIMES, J.


5